**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: January 2021 Short Squeeze Trading Litigation | MDL No. 2989 |

**RESPONSE OF SCHWAB AND TDA DEFENDANTS TO
MOTION FOR TRANSFER OF PLAINTIFFS CHENG AND STERLING**

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Phone: (213) 229-7804
Fax: (213) 229-6804
tboutrous@gibsondunn.com

Jason J. Mendro
Russell B. Balikian
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 887-3726
Fax: (202) 530-9626
jmendro@gibsondunn.com
rbalikian@gibsondunn.com

*Counsel for Charles Schwab & Co., Inc.; TD Ameritrade, Inc.; TD Ameritrade Clearing, Inc.; TD Ameritrade Holding Corporation; and The Charles Schwab Corporation*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 3

DISCUSSION ................................................................................................................................. 6

      I.       The Panel Should Transfer And Consolidate These Actions.................................. 6

      II.      The Panel Should Transfer The Related Actions To The Middle District of Florida. ...................................................................................................................... 8

CONCLUSION ............................................................................................................................. 12

INTRODUCTION

Defendants Charles Schwab & Co., Inc., TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Holding Corporation, and The Charles Schwab Corporation (collectively, "Schwab and TDA") respectfully submit this response to the Motion for Transfer filed by plaintiffs Shane Cheng and Terell Sterling ("Movants") on February 5, 2021, Dkt. 1.

The cases before the Panel are putative class actions filed on the heels of unprecedented volatility in the trading price and volume of several securities beginning in January 2021. These securities included the common stock of GameStop, AMC, and several other companies, which commentators have recently referred to as "meme stocks." The plaintiffs in these duplicative cases assert a wide range of baseless legal theories, all of which arise from the same facts and circumstances: market upheaval that the plaintiffs and class members they purport to represent apparently created through coordinated trading.

Plaintiffs' scattershot complaints fail to meaningfully distinguish one defendant from another, accusing Schwab and TDA—along with a long list of other defendants—of blocking trading in the meme stocks, despite widely available information to the contrary. Simply put, Schwab and TDA **did not** restrict any client from buying or selling any stock during the relevant period.[1] Instead, they implemented discrete risk-mitigation measures to protect themselves—and, by extension, their clients. More specifically, they adjusted margin requirements on select stocks to ensure that clients had enough assets to pay for stock purchases, and they also restricted certain advanced options strategies, reducing the risk that traders would borrow money they could not repay or

---

[1] *See Charles Schwab Corporation Statement on Recent Trading Activity*, Charles Schwab Corp., https://www.aboutschwab.com/schwab-statement-on-recent-trading-activity (posted Jan. 28, 2021) ("Neither Charles Schwab & Co. nor TD Ameritrade halted buying or selling ANY stocks this week. Neither firm restricted buying or selling basic options.").

commit to sell securities they did not own and could not afford to buy. These measures were clearly authorized by Schwab's and TDA's agreements with their respective clients, and were entirely consistent with applicable laws and regulations. Accordingly, because Schwab and TDA did not block anyone from buying or selling meme stocks and their actions were permitted by contract and otherwise lawful, these claims should be swiftly dismissed, wherever they may be litigated.

The question immediately before the Panel is whether it should transfer the dozens of overlapping cases at issue to a single district for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407. It should. Schwab and TDA agree with Movants that the Panel should transfer all the cases listed in their Amended Schedule of Actions, *see* Dkt. 6, as well as numerous tag-along actions, *see*, *e.g.*, Dkt. 66-1 (collectively, the "Related Actions"). In light of the multitude of lawsuits with duplicative allegations, theories, and parties, there can be no reasonable dispute that centralization would promote the just and efficient conduct of this litigation. *See* 28 U.S.C. § 1407(a).

Movants favor centralizing this litigation in the Northern District of California, and it is true that the Northern District is one logical venue, for the reasons they explain. Alternatively, the Middle District of Florida also would be an appropriate venue for these matters, and it offers some advantages over the Northern District of California. The Northern District of California is already heavily burdened with multidistrict litigation ("MDL"), and it has an overloaded docket more generally. It also affords no superior convenience to the parties overall, given that many plaintiffs and defendants in these sprawling putative class actions reside and do business in other States. For example, The Charles Schwab Corporation has recently moved its headquarters to Texas. In con-

trast, the Middle District of Florida is far less burdened with MDLs and has lower overall caseloads. Schwab and TDA accordingly submit that the Middle District of Florida would be the most appropriate venue for the Related Actions.[2]

## BACKGROUND

In January 2021, members of an online forum called "r/WallStreetBets" coordinated to inflate the stock prices of several financially struggling companies, including GameStop Corp. (GME), AMC Entertainment Holdings, Inc. (AMC), Nokia Corporation (NOK), and Naked Brand Group Limited (NAKD). The traders used social media to stoke frenetic trading in these "meme stocks" because they wanted to "punis[h] several major hedge funds" that stood to benefit if stock prices declined—and that stood to lose substantial sums of money if prices increased. *Ross v. Robinhood Financial LLC*, 4:21-cv-292, Dkt. 4, First Am. Compl. ¶ 5 (S.D. Tex. Feb. 11, 2021). The traders succeeded, albeit only temporarily. The price of GME, for example, skyrocketed more than 1,900% between early January and January 27, only to plummet a few days later to 15% of its peak value.

Some traders sought to purchase these volatile "meme stocks" with money borrowed from their brokers, thus compounding the already significant risks associated with these transactions. For example, if a trader finances 50% of a stock purchase with borrowed funds, and the price of that stock then decreases by 60%—as GME did during a single trading day on February 1—the trader would lose 120% of the amount she invested with her own capital and could not repay the broker's loan simply by selling the stock.

---

[2] This response does not constitute an appearance by Schwab or TDA in any of the Related Actions. Schwab and TDA reserve the right to assert all applicable defenses in those individual actions, including without limitation insufficient service of process, improper venue, and lack of personal jurisdiction.

3

Faced with unprecedented market volatility, some brokers allegedly suspended trading on meme stocks through their platforms. This prompted an outcry among affected traders and quickly led to the wave of putative class actions at issue here.

Schwab and TDA did *not* suspend trading in any stock at any time, notwithstanding many irresponsible and unsupported claims to the contrary. They instead applied measures designed to mitigate the risks associated with loaning money to finance risky investments. For example, Schwab and TDA increased "margin" requirements on a stock-by-stock basis, meaning that clients needed to fund purchases of volatile stocks with a higher percentage of their own funds and could not use those stocks as collateral for new loans. Schwab and TDA also required that clients own a security before promising to sell it later at a particular price (*i.e.*, selling call options), thereby protecting against the risk that clients might have to buy the stock later at astronomical prices to cover their obligations—a risk of boundless scope since there is no limit to how high a stock price could climb. All clients affected by these policies had agreed to them in their client agreements with Schwab and TDA. Moreover, regulators have made clear that these policies are lawful.[3]

Nevertheless, Schwab and TDA were swept up in the flood of reflexive class-action lawsuits arising from this market upheaval, and baselessly accused of conspiring with hedge funds to block trading in the meme stocks. The first complaints were filed on January 28 in Florida, New York, Colorado, California, Connecticut, Pennsylvania, New Jersey, and Illinois. Over the course of a few days, additional suits poured into those same jurisdictions, spreading to Texas, Virginia, and Arkansas. Currently, Schwab and TDA are named as defendants in fourteen class actions

---

[3] *See* FINRA, Investor Alert, *Investing with Borrowed Funds: No "Margin" for Error*, https://www.finra.org/investors/alerts/investing-borrowed-funds-no-margin-error (last updated Nov. 26, 2019) (explaining "[y]our firm can increase its 'house' maintenance requirements at any time and is not required to provide you with advance notice").

4

pending in nine different districts across seven States, including the Middle District of Florida, the Central District of California, the Northern District of California, the Southern District of Texas, and the Eastern District of New York—even though Schwab and TDA never suspended trading in the stocks at issue.

The Related Actions all raise similar allegations and claims, and often lump defendants together. A case in the Central District of California, for example, falsely claims that TD Ameritrade joined Robinhood in "depriv[ing] . . . individual investor customers of the ability to transact on their platforms for certain securities." *Kayali v. Robinhood Financial, LLC*, 2:21-cv-835, Dkt. 10, First Am. Compl. ¶ 33 (C.D. Cal. Jan. 29, 2021). The plaintiffs assert claims under the Sherman Antitrust Act and various common-law doctrines, including breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, breach of fiduciary duty, and civil conspiracy. *Id.* ¶¶ 54-97. A District of Colorado case asserts similar common-law claims and claims under the Securities Exchange Act of 1934, baselessly alleging that Schwab and TDA, along with other defendants, "purposefully, willfully, and knowingly removed numerous stocks including but not limited to 'GME', 'BB', 'NOK', 'AMC', 'BBBY', 'EXPR', and 'KOSS' . . . from their trading platforms in the midst of an unprecedented stock rise." *Daniels v. Robinhood Financial, LLC*, 1:21-cv-290, Dkt. 1, Compl. ¶¶ 2, 46-102 (D. Colo. Jan. 28, 2021). The other Related Actions, including numerous tag-along actions, *see, e.g.*, Dkt. 66-1, follow suit. *See, e.g.*, *Lagmanson v. Robinhood Markets, Inc.*, 1:21-cv-541, Dkt. 1, Compl. ¶¶ 55-63 (N.D. Ill. Jan. 29, 2021) (claiming violations of the Exchange Act and the Sherman Act); *Hiscock v. TD Ameritrade, Inc.*, 1:21-cv-624, Dkt. 1, Compl. ¶¶ 49-65 (N.D. Ill. Feb. 3, 2021) (claiming negligence and breach of fiduciary duty); *Schaff v. TD Ameritrade, Inc.*, 8:21-cv-222, Dkt. 1, Compl.

5

¶¶ 42-56 (M.D. Fla. Jan. 29, 2021) (claiming breach of the implied warranty of merchantability and negligence).

In short, the Related Actions all raise overlapping and duplicative claims flowing from the same market events beginning in January 2021. Recognizing these close similarities and the sheer multitude of Related Actions, Movants, who are among the plaintiffs in the underlying litigation, filed the pending Motion for Transfer.

## DISCUSSION

**I.     The Panel Should Transfer And Consolidate These Actions.**

"When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings," as long as the Panel determines that the transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Schwab and TDA agree with Movants that transfer and consolidation under 28 U.S.C. § 1407 is warranted. *See* JPML Rule 6.1(c). Specifically, the Panel should consolidate the Related Actions—that is, the cases listed in Movants' Amended Schedule of Actions, Dkt. 6, as well as all tag-along actions (including those listed at Dkt. 66-1)—and transfer the consolidated cases to a single district for pretrial proceedings.

*Common Questions of Fact.* These lawsuits arise from the same extraordinary events beginning in January 2021, and they assert overlapping and often identical legal claims. There can be no colorable dispute that the Related Actions thus involve "common questions of fact" under 28 U.S.C. § 1407(a). *See supra*, at 3-6. To be sure, the individualized nature of each purported class member's claims against Schwab and TDA would preclude class certification of any claims that survived dismissal, but despite those individualized issues the Related Cases all arise from the

6

same common core of circumstances in the securities markets. Some complaints assert far-fetched theories that other plaintiffs declined to press, but those occasionally distinct legal theories are beside the point: "Transfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core." *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014). Centralization is appropriate because the complaints are bound together by a common core of facts—the underlying market volatility that took place beginning in January 2021.

*Convenience, Justice, and Efficiency.* As other parties have noted, centralization will be dramatically more convenient to the parties and witnesses than separately litigating dozens of class actions across the country, and it will serve the interests of justice and efficiency. *See* 28 U.S.C. § 1407(a). The sheer number of class actions strongly supports transfer and consolidation. As the Panel has recognized, the "potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts." *In re Multidistrict Private Civil Treble Damage Litig. Involving Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970). Here, there are nearly fifty putative class actions pending. Several sets of defendants, including Schwab and TDA, are named in more than a dozen of them. Allowing these Related Actions to proceed in separate courts not only would be exceptionally burdensome, but also carries an acute risk of "inconsistent rulings on class certification" and other important pretrial matters. *In re Portfolio Recovery Assocs., LLC, Tel. Consumer Prot. Act Litig.*, 846 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011). Centralization of these actions, by contrast, "will eliminate

duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification and *Daubert* motions; and conserve the resources of the parties, their counsel, and the judiciary." *In re Google Antitrust Litig.*, — F. Supp. 3d —, 2021 WL 409555, at *2 (J.P.M.L. Feb. 5, 2021). Transfer and consolidation is particularly appropriate because the Related Actions, including the tag-along actions, are all in "early stage[s]" of litigation. *In re BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d 1376, 1379 (J.P.M.L. 2010).

*Infeasibility of Alternatives.* Plaintiffs and defendants agree that alternatives to centralization under 28 U.S.C. § 1407 are not feasible. As in other large MDLs, "voluntary coordination" to settle on a single venue is "impracticable especially given the large number of involved defendants." *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d at 1390. And even if the parties could settle on a venue, transfer under 28 U.S.C. § 1404 would require filing almost as many transfer motions as there are lawsuits, meaning that there still would be a risk of divided and inefficient litigation if any of these motions were denied. Given the "present number of cases, districts, and involved counsel, as well as the complexity of the issues presented," *In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016), the just and efficient course is for this Panel to consolidate these cases and transfer them to a single district court.

II. **The Panel Should Transfer The Related Actions To The Middle District of Florida.**

Several factors traditionally inform the Panel's selection of a transferee district. In particular, it is important to consider "where the cost and inconvenience will be minimized" and the "caseloads of available judges," along with their experience and skill. *Manual for Complex Litigation, Fourth* § 20.131 (2004). Other relevant factors include where cases have progressed furthest, the district where the largest number of cases is pending, and the site of the occurrence of the common facts. *Id.*

8

Here, several important factors support transfer to the Middle District of Florida. It is the principal place of business of Robinhood Securities, LLC, a broker-dealer defendant who is named in many of the complaints, and it is tied with the Northern District of Illinois for the second-highest number of Related Actions pending before it.[4] Further, the Middle District of Florida compares favorably to the Northern District of California and the Northern District of Illinois on virtually every case-related metric. Only one of the four judges assigned to a Related Action in the Middle District of Florida is currently presiding over any MDLs, making it more likely that available judges will have "the capacity to handle this docket." *In re Lending Tree, LLC, Customer Data Sec. Breach Litig.*, 581 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008). By contrast, each of the judges assigned to a Related Action in the Northern District of California already has at least one ongoing MDL on the docket.[5] Similarly, two of the three judges assigned to a Related Action in the Northern District of Illinois have one or more ongoing MDLs.[6]

The Middle District of Florida also has a low overall volume of MDLs, with just two, and in that regard is "underutilized" as a transferee district. *In re Lending Tree*, 581 F. Supp. 2d at 1368. By contrast, the Northern District of California has nineteen ongoing MDLs—the most of

---

[4] The five cases pending in the Middle District of Florida include *Diamond v. Robinhood Financial, LLC*, 6:21-cv-207; *Schaff v. Robinhood Markets, Inc.*, 8:21-cv-216; *Schaff v. TD Ameritrade, Inc.*, 8:21-cv-222; and *Perri v. Robinhood Markets, Inc.*, 8:21-cv-234; as well as *Zelewski v. Robinhood Markets, Inc.*, 8:21-cv-329, which Schwab and TDA understand will be noticed as a tag-along action.

[5] *See MDL No. 1917 In re Cathode Ray Tube (CRT) Antitrust Litig.*, 4:07-cv-5944; *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 3:18-md-2843; *In re Roundup Prods. Liab. Litig.*, 3:16-md-2741; *In re United Specialty Ins. Co. Ski Pass Ins. Litig.*, 4:20-md-2975; *In re StubHub Refund Litig.*, 4:20-md-2951; *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 3:19-md-2918.

[6] *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 1:14-cv-1748; *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 1:13-cv-9116; *In re TikTok, Inc., Consumer Privacy Litig.*, 1:20-cv-4699.

any district in the country—and the Northern District of Illinois has thirteen.[7]  Some of the MDLs in these two districts have been ongoing for many years.  Assigning this litigation to a court or judge with fewer MDLs would better facilitate the efficient resolution of these dozens of cases.  *See In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 932 (J.P.M.L. 1980) (transferring cases to a district that had "drastically fewer multidistrict litigations than any of the other suggested transferee districts").

In addition to having fewer MDLs, the Middle District of Florida has a lower overall caseload than both the Northern District of California and the Northern District of Illinois.  As of September 30, 2020, the Northern District of California had 870 pending cases per judgeship—the eleventh-highest average in the country—and the median time from filing to disposition for civil cases was 11.4 months.  *See* Administrative Office of the U.S. Courts, *U.S. District Courts – Federal Court Management Statistics – Comparison Within Circuit* (Sept. 30, 2020).[8]  Similarly, as of September 2020, the Northern District of Illinois had 714 pending cases per judgeship, and a median disposition time of 10.6 months.  *Id.*  The Middle District of Florida, by contrast, had 584 pending cases per judgeship, and a median time for disposition of just 6.2 months.  *Id.*  The Middle District of Florida is thus "in a better position to process this litigation toward its most expeditious conclusion."  *In re Preferential Drug Prods. Pricing Antitrust Litig.*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977) (choosing a district with a "median tim[e] from filing to disposition . . . for civil actions" that was "significantly shorter" than the alternative district); *see also*, *e.g.*, *In re Petrol. Prods. Antitrust Litig.*, 419 F. Supp. 712, 719 (J.P.M.L. 1976) (choosing a district that "ha[d] a

---

[7] *See* JPML, *MDL Statistics Report – Distribution of Pending MDL Dockets by District*, https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-February-17-2021.pdf (Report Date: Feb. 17, 2021).

[8] Available at https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0930.2020.pdf.

significantly lighter caseload per judge and terminate[d] actions significantly quicker" than the alternative district).

Movants note that a plurality of the cases at issue here have been filed in the Northern District of California. As an initial matter, Movants' preference is not entitled to any special weight or deference, as this Panel "must weigh the interests of all of the plaintiffs and all of the defendants." *In re Master Key*, 320 F. Supp. 1404, 1406 (J.P.M.L. 1971). Moreover, for purposes of this litigation, the difference between the Northern District of California and the Middle District of Florida is minimized by the increasing use of remote proceedings during the COVID-19 pandemic and the fact that many parties do not hail from California at all. For example, The Charles Schwab Corporation—which is the parent company for Charles Schwab & Co., Inc., TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., and TD Ameritrade Holding Corporation—is now headquartered in Westlake, Texas. Indeed, nine sets of plaintiffs filed suit in Florida, and the lawsuits are spread elsewhere in the United States too. Considerations of cost and convenience for the parties and the witnesses thus do not militate strongly in favor of any particular jurisdiction. *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 290 F. Supp. 2d 1374, 1375-76 (J.P.M.L. 2003) (concluding that no one district stood out as the focal point for the litigation "[g]iven the range of locations of parties and witnesses, the geographic dispersal of constituent actions, and the number of suggested transferee districts," and transferring the cases to a district that "does not currently have multidistrict dockets" and that has "the present resources to devote to pretrial matters that this docket is likely to require").[9]

---

[9] Several defendants seek transfer to the Southern District of Texas. Schwab and TDA have no objection to that proposal. The Southern District of Texas also is underutilized as a transferee district for MDLs and would be an appropriate venue for this matter for the reasons set forth in the brief of Apex Clearing Corporation.

11

## CONCLUSION

The Panel should transfer and consolidate the Related Actions—including all tag-along actions, such as those listed at Dkt. 66-1—and select the Middle District of Florida as the transferee district.

Dated:  March 1, 2021                                    Respectfully submitted,

/s/ Jason J. Mendro
Jason J. Mendro
   *Counsel of Record*

Theodore J. Boutrous, Jr.                          Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP            Russell B. Balikian
333 South Grand Avenue                         GIBSON, DUNN & CRUTCHER LLP
Los Angeles, CA  90071                            1050 Connecticut Avenue, N.W.
Phone: (213) 229-7804                              Washington, D.C.  20036
Fax: (213) 229-6804                                    Phone: (202) 887-3726
tboutrous@gibsondunn.com                    Fax: (202) 530-9626
                                                                       jmendro@gibsondunn.com
                                                                       rbalikian@gibsondunn.com

*Counsel for Charles Schwab & Co., Inc.; TD Ameritrade, Inc.; TD Ameritrade Clearing, Inc.; TD Ameritrade Holding Corporation; and The Charles Schwab Corporation*